# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
Assigned on Briefs March 19, 2013

## STATE OF TENNESSEE v. KEITH ALLEN POWELL

**Appeal from the Circuit Court of Robertson County**
**Nos. 74CC2-2010-CR-774, 74CC2-2012-CR-150, -151, -264**
**Michael R. Jones, Judge**

_____

**No. M2012-01442-CCA-R3-CD - Filed May 31, 2013**

_____

Keith Allen Powell ("the Defendant") pleaded guilty to two counts of theft of property over $1,000, Class D felonies, and one count of simple possession of Lortab and Soma pills, a Class A misdemeanor. The plea agreement provided that the Defendant would serve concurrent sentences for the two theft convictions but otherwise left sentencing for all the convictions open to the trial court. At the time of sentencing, the Defendant also had a community corrections violation for an additional conviction of theft of property over $1,000. Following the sentencing hearing, the trial court sentenced the Defendant to an effective sentence of four years' incarceration. The Defendant has appealed the trial court's sentence, asserting that the trial court erred in requiring the Defendant to serve his sentence in confinement. Upon a thorough review of the record, we affirm the trial court's judgments.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments
## of the Circuit Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Roger E. Nell, District Public Defender; and Timothy J. Richter, Assistant Public Defender, Springfield, Tennessee, for the appellant, Keith Allen Powell.

Robert E. Cooper, Jr., Attorney General & Reporter; Meredith DeVault, Senior Counsel; John W. Carney, District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

On January 28, 2011, the Defendant pleaded guilty to one count of theft of property over $1,000 and was ordered to pay $800 in restitution. The trial court, following a sentencing hearing, sentenced the Defendant to two years on community corrections. On February 15, 2012, a Robertson County grand jury indicted the Defendant on one count of theft of property over $1,000 and burglary of Quality Mobile Maintenance. The Defendant subsequently entered an open plea to the charge for theft of property over $1,000. Pursuant to the plea agreement, he would be sentenced as a Range I offender, and the burglary charge was dismissed.

Also on February 15, 2012, a Robertson County grand jury indicted the Defendant on one count each of driving under the influence ("DUI"), possession of Lortab and Soma pills, driving without proof of valid insurance, and driving a vehicle with a registration tag registered to another vehicle. The Defendant entered an open plea to the charge for simple possession of Lortab and Soma pills. Pursuant to the plea agreement, the other charges were dismissed.

Finally, on April 19, 2012, a Robertson County grand jury indicted the Defendant on one count of theft of property over $10,000 belonging to Judy Gregory and Dorian Gregory. The Defendant subsequently entered an open plea to theft of property over $1,000. Pursuant to his plea agreement, the Defendant would be sentenced as a Range I offender by the trial court, but the sentence for this conviction, to be determined by the trial court, would run concurrent to the sentence for the other theft conviction.

The trial court held a sentencing hearing for all of the above convictions on June 14, 2012.[1] At the hearing, Fletcher L. Forsyth, an employee at Quality Mobile Maintenance, testified that his company repairs tractor trailer trucks. He identified his boss as Terry Nicholson. Forsyth stated that the "shop" holds tools, batteries, machinery, and "anything to do with working tractor trailer trucks." On December 15, 2011, Forsyth was returning from Lebanon with another man to drop off a trailer, and, upon reaching the shop, they "noticed some lights come on at the back of the building." He estimated that they were approximately "a football field and a half away" from the shop. As they approached the building, he observed a vehicle driving away that he did not recognize. Forsyth also noticed "[a] lot of weight in the rear of the vehicle."

---

[1] At this sentencing hearing, the trial court also addressed the Defendant's violation of his community corrections' sentence.

Upon reaching the shop, Forsyth called to confirm that the building already had been locked up, and he then began to inventory the items in the shop. He did not see any tools missing but realized "that all the batteries on [the] battery bin were gone, brand new truck batteries, [and] some rims were missing." He estimated that they had eighteen to twenty batteries missing and that each battery cost approximately $110. He only could recall one set of rims missing but could not give an approximate value for these rims. Additionally, approximately eleven to sixteen used batteries were missing that were worth approximately $10 each. As far as damage, a recreational vehicle was in the shop, and the door "had been jammed," which "really damaged . . . [the] door."

Forsyth remembered seeing the Defendant once at the shop with another truck driver, but he did not know the Defendant personally. On cross-examination, Forsyth explained that his estimation on the number of new batteries missing stemmed from seeing the "stocked" shelves the day before and knowing about how many batteries fit on the shelves.

Jerry Nicholson, the owner of Quality Mobile Maintenance, testified that he was not present on December 15, 2011, the day that this theft occurred. Once he arrived at the shop, he identified the following missing items: batteries, a wheel, and "a little bit later on we found out that there was some stuff outside that was gone, but we can't account that with what happened that night."

Nicholson estimated that approximately twelve to eighteen new batteries were missing. He stated that each battery cost him $89 and that he would have sold each battery for $122. He also described the "wheel" as "aluminum alloy wheels for steer axle," but he only could state definitively that one was missing. He approximated that this wheel cost him $400. As for the used batteries that were missing, he knew of at least four Mac batteries worth approximately $15 each and four to twenty other old batteries worth approximately $25 each.

Nicholson agreed that he had insurance to cover some of the stolen items, but he did not file a claim because of his high deductible. He later retrieved the wheel, which was still in new condition, but never retrieved any of the batteries. The State asked Nicholson whether he had anything to say to the Defendant, and Nicholson responded, "I put in an inventory system. I bought a computer system to put in a complete inventory system that we can keep up with now. I spent about $8,000 on a video monitoring system and a burglar alarm to keep you out." He estimated that the total cost of the inventory system was approximately $6,000.

Nicholson denied ever seeing or meeting the Defendant prior to this incident. On cross-examination, Nicholson could not identify which used batteries would be sold "for

scrap" or as used batteries. He stated that his business had been at that location for four years. About eight months prior to this incident, 160 "scrap batteries" were stolen. Accordingly, he "put in [a] chain-link fence and lock[ed] up some stuff" that they had not previously.

Judy Gregory[2] testified that she had resided in Ridgetop on Lynn Circle since 1989. She had known the Defendant since he was approximately nineteen or twenty years old because he had dated her daughter over the past several years. She agreed that she and her family trusted the Defendant inside their house. At some point in the fall of 2011, Judy noticed that she was "missing pieces of jewelry along the way." Ultimately, she estimated that fifty to sixty pieces of jewelry were missing, including "bracelets, necklaces, earrings, [and] rings." She specifically noted that she was missing a wedding band that "had been cut in half" and her mother's engagement ring.

After speaking with the detective in this case, she learned that approximately fifteen to twenty pieces of her jewelry had been sold to the Gold Store by the Defendant. One of the pieces sold was the "broken ring." However, she never retrieved any of these pieces. She filed an insurance claim for approximately $12,000 worth of stolen jewelry, but because she did not have additional jewelry insurance she only received $2,500. Accordingly, she estimated that she lost a total of approximately $7,500 to $9,500.

Judy testified that, once she learned that the Defendant was the individual who stole the jewelry, she "felt violated quite frankly. I mean, I felt like we'd let someone in our home and they had completely betrayed us." She never imagined that the Defendant would do this act, and she requested a "no contact" order if the court released the Defendant.

Cara Gregory[3] testified that she had dated the Defendant "[o]ff and on for the last eight years." They had resumed dating in July or August of 2010. In the fall of 2011, Cara was working from her parents' house out of their garage. Two to three times a week, the Defendant would come to visit her during the day. Sometimes, he would go into other areas of the house "to use the rest room, or he would go upstairs and watch [television] for a little while, get something to eat, something to drink." She had no idea that the Defendant was "snooping around" in her mother's bedroom, and she was "[v]ery hurt" once she found out. She did not want the Defendant returning to her parents' house after this incident.

---

[2] Because two witnesses share a common surname, we will refer to these witnesses using their given names. We intend no disrespect.

[3] The State identified this witness as Cara Gregory. The witness, however, identified herself as Cara Idahosa.

On cross-examination, Cara denied ever accompanying the Defendant to pawn jewelry. However, she then stated that she, in fact, did join the Defendant to pawn some jewelry, but she insisted that the jewelry was his mother's jewelry and not her mother's jewelry. Cara acknowledged that she pawned one of the Defendant's mother's pieces of jewelry in her own name, in addition to a diamond. Later in her testimony, however, she stated that the ring she pawned actually belonged to her but that she told the Defendant that it belonged to her mother.

The State rested its proof, and the defense called Kelly Ard to testify. Ard testified that she currently was an intern with the public defender's office and also worked at Mobile Crisis with Centerstone. Her responsibilities at the public defender's office included "getting [clients] into alcohol and drug treatment." She met the Defendant when she completed an assessment on him for potential alcohol and drug treatment. She determined that the Defendant had a history of drug and alcohol use, particularly with the use of Lortab and Soma pills, and she matched the Defendant with a treatment facility called Buffalo Valley.

She agreed that this treatment facility lasts a minimum of twenty-eight days and would promote abstinence of drugs and alcohol. From there, the Defendant likely would qualify for transitional housing associated with the facility. In this transitional housing, his continued treatment would include "a group therapy session[,] case managers, which . . . help with financial needs and getting him to those meetings, and having a sponsor and things like that." In total, the treatment could last up to a year, depending on factors such as whether the Defendant "voluntarily" participated in the treatment. She believed that the Defendant was interested in treatment "from one standpoint."

On cross-examination, the State asked Ard why she did not consider a more long-term treatment program for the Defendant. Ard responded that the Defendant told her that he did not want anything long-term. However, she agreed on redirect examination that most of the programs across the state are short-term, like the program at Buffalo Valley.

Christopher Powell, the Defendant's younger brother, testified that he and the Defendant lived together only in the summertime growing up because their parents separated. However, they reunited in 1998 when Powell moved back to Tennessee. Powell knew that approximately seven to eight years ago the Defendant began to use pain killers. Since that time, Powell noticed a difference in the Defendant, and Powell "bec[a]me a victim too." Prior to the Defendant's use of pain killers, they "were good buddies; fishing, hunting buddies," but at the hearing Powell was "mad at him." Despite being mad at the Defendant, however, Powell was willing to take the Defendant to treatment.

Robert Hurt, another brother of the Defendant, testified that they did not live together most of their childhoods but that, since approximately 1990, they had lived near each other. However, in discussing their current relationship, Hurt stated, "I told [the Defendant] right now I don't trust him anymore. . . . I mean, I love him, I'll do anything for him but he's got to – he's got to do for hi[m]self first." He believed that the reason for the change in the Defendant was due to an "[a]buse of pain medicine."

The Defendant testified that he had a "CDL"[4] which had allowed him to support himself over the past eighteen years. He agreed that, up until ten years previously, he never had any "trouble with the law." Approximately six or seven years prior to the hearing, he began abusing pain medication because of his "deteriorating spine." Then, about three or four years later, the Defendant was in a serious car accident which resulted in surgery and seven to eight months of recovery. During that time, he had to take more pain medication to get ample relief from the pain. He acknowledged that, within a year of the accident, he still was taking more medication than was necessary to manage his pain.

The Defendant stated that he had been in jail for the six months leading up to the hearing, which was his first overnight jail experience. He confirmed that, in that time, the pain medication had "cleared [his] system." Prior to going to jail, he spent approximately $150 per day for pain medication to satisfy his habit. He believed that he would benefit from a treatment program such as Buffalo Valley. According to the Defendant, his CDL was still valid, and he could make as much as approximately $20 per hour driving a truck.

The Defendant noted that he had identified another individual to law enforcement who was with him during the incident at Quality Mobile Service but that, to his knowledge, that individual had not been arrested in relation to the incident. He split the proceeds from selling the batteries with this individual. He expressed his desire to repair his relationships with his family members and to repay the victims.

On cross-examination, the Defendant denied ever seeking treatment in the past for his pain medication addiction. He agreed that, prior to the accident, he was "able to finance [his] pill problem by working" but that, in 2010, he no longer could work because of the accident. As a result, he no longer had any money for pills. He further acknowledged that, in July 2010, he stole someone's trailer, sold it, and subsequently was placed on community corrections for that offense. His problem continued as he began to steal jewelry from Judy. He admitted that he pawned the jewelry from September until December of 2011. The Defendant stated that he gave some of the money from the jewelry to Cara.

---

[4] Although not defined at the hearing, we assume that "CDL" stands for "Commercial Driver's License."

At the conclusion of the sentencing hearing, the trial court considered, as mitigating factors, that the Defendant entered guilty pleas in all of these cases and that "his criminal conduct neither caused nor threatened serious bodily injury," but it gave no weight to this latter factor. As for enhancement factors, the trial court applied the factor considering the Defendant's previous criminal history, noting that the Defendant's convictions were "more th[a]n necessary to establish the range." The trial court also applied the factor recognizing that the Defendant was on community corrections at the time he committed the underlying offenses.

The trial court noted that the Defendant had not yet paid any of the restitution he was ordered to pay for the case in which he received community corrections. Additionally, the court noted that the Defendant had a charge pending in Kentucky and that he had failed to appear in that case, likely because he was in jail for the present offenses.

For violating his community corrections' sentence, the trial court re-sentenced the Defendant to two years, with the requirement to pay the previously agreed-upon restitution of $800. The trial court awarded him credit from his community corrections and jail credit. The trial court then sentenced the Defendant to eleven months, twenty-nine days for his simple possession conviction. Regarding the two convictions for theft of property over $1,000, the trial court sentenced the Defendant to four years for each conviction, stating "the prior conviction . . . and being on community corrections greatly outweigh any mitigating factors." The court ordered the Defendant to pay restitution of $7,500 for the theft involving the jewelry and $1,230 for the theft at Quality Mobile Service. The trial court ordered all the sentences to run concurrently. In considering confinement, the court stated:

> Now, 40-35-103, sentences involving confinement should be based on the following consideration: Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct. This man has a long history now of criminal conduct. He doesn't mind stealing from anyone apparently; girlfriend o[r] – somebody he doesn't know; just doesn't matter.
>
> Under subsection three, measures less restrictive th[a]n confinement have recently been applied unsuccessfully to the defendant. He was on community corrections, and he committed crimes while on community corrections so he'll serve those in the Tennessee Department of Correction[].

The Defendant timely appealed.

## Analysis

The Defendant argues on appeal that his sentence of confinement is improper. Specifically, the Defendant contends that he "is presumed to be a favorable candidate for alternative sentencing" and that, thus, the trial court erred in ordering him to serve his sentence in incarceration.[5]

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

Our supreme court has held that the Bise standard of review also is applicable to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 279 (Tenn. 2012). Thus, in reviewing a trial court's denial of full probation, the applicable standard of review is abuse of discretion with a presumption of reasonableness so long as the sentence "reflect[s] a decision based upon the purposes and principles of sentencing." Id.

We first note that the Defendant failed to include a transcript of the guilty plea hearing. It is the Defendant's duty to compile a complete record for appeal. See Tenn. R. App. P. 24(b). Our supreme court, however, recently held that, "when a record does not include a transcript of the hearing on a guilty plea, the Court of Criminal Appeals should determine on a case-by-case basis whether the record is sufficient for a meaningful review under the standard adopted in Bise." Caudle, 388 S.W.3d at 279. As indicated above, the facts underlying the Defendant's guilty plea were adduced during the sentencing hearing. Thus, based upon the specific facts of this case, we conclude that the record is sufficient to afford appellate review of the Defendant's sentence.

---

[5] The Defendant does not challenge the length of his sentence or the revocation of his community corrections' sentence, so we will not address those issues in our analysis.

In making its sentencing determination, a trial court must consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010). The trial judge also should consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5) (2010).

When a court determines the manner of service of a sentence, a defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" Tenn. Code Ann § 40-35-102(5)-(6)(A) (2010). However, the trial court is "not bound" by this advisory sentencing guideline; rather, it "shall consider" it. Id. § 40-35-102(6)(D). The defendant bears the burden of establishing his or her suitability for full probation. See Carter, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-303(b)); State v. Mounger, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" Carter, 254 S.W.3d at 347 (citations omitted).

As stated above, the Defendant challenges the trial court's imposition of a period of confinement. In determining whether to deny full probation and impose a sentence involving confinement, the trial court should consider the following:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1); see also Carter, 254 S.W.3d at 347. The principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. Tenn. Code Ann. § -103(2), (4). A trial court also should consider a defendant's potential for rehabilitation or lack thereof when determining the manner or length of the sentence. Id. § -103(5). Additionally, a trial court may "apply the mitigating and enhancement factors set forth in [Tennessee Code Annotated sections 40-35-113 and -114], as they are relevant to the [section] 40-35-103 considerations." State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996) (citing Tenn. Code Ann. § 40-35-210(b)(5) (1990)).

We hold that the trial court did not abuse its discretion in sentencing the Defendant to confinement. At the conclusion of the sentencing hearing, the trial court noted that it had considered "[t]he presentence report, the principles of sentencing and arguments as to sentencing alternatives, the nature and characteristics of criminal conduct involved, the evidence and information offered by the parties, and the mitigating and enhancement factors."

In considering confinement, the trial court stated that the Defendant "has a long history now of criminal conduct. He doesn't mind stealing from anyone apparently; girlfriend o[r] – somebody he doesn't know; just doesn't matter." See Tenn. Code Ann. § 40-35-103(1)(A). Additionally, the court found that "measures less restrictive th[a]n confinement have recently been applied unsuccessfully to the defendant." See id.§-103(1)(C). Specifically, it noted, "[The Defendant] was on community corrections, and he committed crimes while on community corrections so he'll serve those in the Tennessee Department of Correction[]."

The Defendant contends that he "is presumed to be a favorable candidate for alternative sentencing." However, "[o]ur General Assembly removed the original language creating a 'presumption' that certain defendants qualified as favorable candidates for alternative sentencing." Caudle, 388 S.W.3d at 278. Rather, the current statutory language, as stated above, provides that a "favorable candidate" – one who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D or E felony, *should* be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" Tenn. Code Ann § 40-35-102(6)(A) (emphasis added). Further, this Court "shall consider, but *is not bound* by, this advisory sentencing guideline." Id. § -102(6)(D) (emphasis added). As the court so found, the Defendant failed his past rehabilitation attempt by committing these underlying offenses while on community corrections. Thus, the Defendant is not "a favorable candidate for alternative sentencing options." See id.

We discern no error by the trial court in ordering the Defendant to serve the entirety of his sentence in confinement. The record reflects that the trial court considered the appropriate sentencing principles, and the proof in the record before us clearly does not rebut the presumption of reasonableness afforded the trial court's decision. See Bise, 380 S.W.3d at 709. Accordingly, the Defendant is not entitled to relief on this issue.

## Conclusion

The trial court did not err in ordering the Defendant to serve his sentence in confinement. Accordingly, the judgments of the trial court are affirmed.

_____
JEFFREY S. BIVINS, JUDGE